Argued and submitted December 20, 2019; conviction on Count 8 reversed, conviction on Counts 1, 2, 6, and 7 reversed and remanded, otherwise affirmed February 9, 2022

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# LYNN EDWARD BENTON,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1201792; A164057

505 P3d 975

Defendant appeals from a judgment of conviction for aggravated murder and attempted murder, raising 31 assignments of error. The Court of Appeals addressed three categories of claimed error and did not reach defendant's remaining assignments of error. Those three categories are (1) defendant's assignments of error to the trial court's denials of defendant's demurrers, motions to dismiss, and motions for judgment of acquittal based on an alleged variance in proof between the indictment and the evidence presented at trial, (2) defendant's assignments of error to the trial court's denial of his motion to suppress statements defendant made to a jailhouse informant on the ground that the informant was a state agent, and (3) defendant's assignment of error to the trial court's refusal to conduct an *in camera* review of the records of Dr. Guyton, who was hired by the attorney for the jailhouse informant to perform a psychological evaluation of him. *Held*: (1) The trial court did not err in denying defendant's demurrers, motions to dismiss, and motions for judgment of acquittal, because the alleged variances in proof were neither material nor prejudicial. (2) The jailhouse informant was acting as a state agent after July 2, 2015, triggering the state constitutional protections of the exclusionary rule. The trial court erred when it denied defendant's motion to suppress statements made by defendant to the informant after that date, requiring reversal and remand of defendant's convictions. (3) The trial court did not err in refusing to conduct an *in camera* review of Guyton's records, because defendant did not make a sufficient threshold showing for such a review. (4) Additionally, the attempted murder conviction was reversed for the trial court to enter a judgment reflecting its post-judgment dismissal of that count.

Conviction on Count 8 reversed; conviction on Counts 1, 2, 6, and 7 reversed and remanded; otherwise affirmed.

Kathie F. Steele, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, and Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Conviction on Count 8 reversed; conviction on Counts 1, 2, 6, and 7 reversed and remanded; otherwise affirmed.

## ORTEGA, P. J.

Defendant appeals from a judgment of conviction for aggravated murder and attempted murder. A jury found defendant guilty of two counts of aggravated murder (Counts 1 and 2), two counts of conspiracy (Counts 6 and 7), and one count of attempted murder (Count 8), and the trial court merged the guilty verdicts on Counts 2, 6, and 7 into the guilty verdict on Count 1, for a single conviction of aggravated murder.[1] Defendant asserts 31 assignments of error on appeal.[2] In this opinion, we address only defendant's assignments of error 6 through 17, and, based on our disposition of those assignments, we need not reach defendant's remaining assignments of error.

In assignments of error 11 through 17, defendant challenges the trial court's denials of defendant's demurrers, motions to dismiss, and motions for judgment of acquittal based on an alleged variance in proof between the indictment and the evidence presented at trial for Counts 6 through 8. Although, as explained below, we reverse Count 8 because the trial court ultimately dismissed that count based on defendant's post-judgment motion, we consider defendant's assignments with respect to Count 8, as well as with respect to Counts 6 and 7, because he argues that the trial court's failure to dismiss Count 8 earlier in the

---

[1] The trial court granted defendant's motions for judgment of acquittal on three counts of solicitation (Counts 3, 4, and 5). We "otherwise affirm" those acquittals in our disposition of this case.

[2] In supplemental briefing, defendant also brings challenges under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), which we reject with respect to Counts 6 and 7 and which we do not reach with respect to Count 8.

Here, the trial court instructed the jury that it could find defendant guilty of aggravated murder only by a unanimous verdict (Counts 1 and 2). The court also instructed the jury that it could find defendant guilty of the remaining counts (Counts 6, 7, and 8) by a nonunanimous vote of 10 jurors, which was error under *Ramos*. The jury's guilty verdict on Count 8, attempted murder, was nonunanimous. As a result, ordinarily we would reverse and remand Count 8. *State v. Flores Ramos*, 367 Or 292, 297, 478 P3d 515 (2020). However, as discussed below, because the trial court granted defendant's post-judgment motion to dismiss Count 8, but did not enter a corrected judgment dismissing that count, we instead reverse Count 8, without remand, on that basis. The jury returned a unanimous verdict on both Counts 6 and 7. Thus, we conclude that any error in giving a nonunanimous jury instruction on Counts 6 and 7 was harmless as to those counts. *Id.* at 333-34.

proceedings prejudiced his trial. We conclude that the trial court did not err.

In assignments of error 7 through 10, defendant challenges the trial court's denial of his motion to suppress statements defendant made to a jailhouse informant on the ground that the informant was a state agent. We conclude that the jailhouse informant was acting as a state agent after July 2, 2015, triggering the state constitutional protections of the exclusionary rule. Thus, the trial court erred when it denied defendant's motion to suppress statements made by defendant to the informant after that date. We also conclude that that error was not harmless and reverse and remand Counts 1, 2, 6, and 7 on that basis. We also reverse Count 8, but without a remand. The trial court granted defendant's post-judgment motion and dismissed Count 8, which ruling is not challenged on appeal; however, the trial court did not enter a corrected judgment dismissing Count 8. Thus, we reverse defendant's conviction on Count 8 for the trial court to enter a judgment reflecting its dismissal of that count.

Finally, we also address defendant's sixth assignment of error, because it raises an issue of law that will likely arise on remand and we determine that it is appropriate to address the merits of that issue in this opinion. In that assignment, defendant argues that the trial court erred when it refused to conduct an *in camera* review of the records of Dr. Guyton, who was hired by the attorney for the jailhouse informant to perform a psychological evaluation of him in 2014. We conclude that the trial court did not err in refusing to conduct an *in camera* review, because defendant did not make a sufficient threshold showing that those records contain *Brady* material.

## I.   BACKGROUND FACTS

Because of the complexity of this case and the varied assignments of error that we address, we discuss many facts, both historical and procedural, only in the sections pertaining to specific assignments of error. The following recites only the most pertinent trial testimony to provide context for the more specific discussions in our analysis.

Defendant was a police sergeant in Gladstone, which is located in Clackamas County. On the evening of May 28, 2011, defendant, Hopperstad, and Scholz found the victim, defendant's estranged wife, dead inside the beauty salon that she owned, which was located across the street and down the block from the police station. Defendant was on duty when Hopperstad retrieved him to open the salon because the victim was not responding to Scholz's knocks on the door. Defendant opened the salon door with a key, entered using his flashlight, and found the victim in the back-office area of the salon. Defendant reacted by screaming, sobbing, and falling to his knees, but he did not fully enter the back room. He appeared to check the victim's pulse; Hopperstad asked if they should call for emergency medical assistance, and defendant said no. Defendant, who at one time was a paramedic, did not attempt any first aid on the victim, and Hopperstad, also a trained first responder, deferred to defendant's assessment because defendant had more experience. Hopperstad asked defendant if he should call someone over; defendant said no and then radioed for assistance.

A sergeant responded to the scene and called the medical examiner. An investigator for the medical examiner conducted an initial examination of the victim and, due to her lack of experience, made a preliminary assessment at the scene that the victim died of natural causes. After a more senior investigator examined the body and saw reasons to question that assessment, the investigation shifted, and the medical examiner conducted an autopsy. The examiner found that, externally, the victim's left eye was black and she had cuts on her lips, an abrasion on her chin, a left scalp hemorrhage, bruises on her arms and left thigh, and indications of blunt force trauma. Internally, the victim had broken ribs and a lacerated liver, and she had been shot in the back, with the .25 caliber bullet still lodged in her spinal cord. She also had injuries to the structures in her neck. The examiner determined that the cause of death was "gunshot wound to the back, neck compression/strangulation, and blunt force chest and abdominal trauma."

Just after midnight on the day that the victim died, believing that the victim had died of natural causes, the police detective interviewed defendant. Defendant reported

that he and the victim had started dating in about 2008, registered a domestic partnership in 2009, and married in October 2010. In 2010, defendant, who is a trans man, had begun to transition, which included hormone therapy; he explained that, as he became more masculine, the victim had problems with it. Around April 1, 2011, about two months before the victim died, they had a huge fight, and defendant moved out of the couples' home and in with his sister. He said that he had not seen or spoken with the victim for about two weeks before her death.

When asked about physical altercations, defendant reported that one time he lost his temper and "kind of pinned [the victim] into a corner just with my arm and made her listen to me." He stated that he had also learned from the victim's mother that the victim claimed that he "had gotten physical with her" and that he was concerned about that when he left in April; the victim was claiming that he had caused a bruise on her arm and he was nervous about how that could affect his career. On being asked, defendant reported that the victim was taking several medications, including Celexa, Flexeril, Oxycodone for pain, and that "I learned that she just got put on some Fentanyl patches" for pain in her shoulder. The detective also seized two cellphones that defendant had on him during the interview. Defendant at first only gave the detective his work phone, but the other phone rang during the interview. Defendant said that he had forgotten about that phone and did not use it much, but also said he did use it since he and the victim had split up, and handed it over. The police later determined that defendant used the phone often, including to talk to his friend, Campbell. Defendant had also received a call earlier that day in front of two detectives that made him "very agitated and frustrated." The police determined that that call likely came from Campbell's phone.

Later, the same detective who interviewed defendant met him and his sister at his sister's house. There, the detective asked defendant about scratches and red marks on his arm. In response, defendant went pale, hesitated, and then told the detective that the scratches were from a use of force issue the day before. During that conversation,

defendant told the detective that the victim had pictures of injuries that she claimed defendant had caused.

At trial, the victim's friends, sister, and counselor testified about statements the victim made during the last two months of her life about defendant physically abusing her and causing her to need surgery on her shoulder. In the month before she died, the victim had emptied a safe deposit box held jointly with defendant. Defendant asked about the box at the bank a few days after she did that, and he also complained to the city administrator about two weeks before the victim's death that she had betrayed him and had taken money. After her death, the police found about $9,600 in cash in the victim's home safe.

Within two days of the victim's death, Pfortmiller contacted the police about her former neighbor, Campbell. At the time, Pfortmiller was living in Portland, but she had been Campbell's neighbor and close friend for about 15 years, since Pfortmiller was 13 years old. She first met defendant, who was friends with Campbell, about 12 years before the victim's death. She testified that defendant would come over to Campbell's house "all the time" on his days off and when he was on duty. Pfortmiller testified that Campbell is "very unhealthy and destructive to herself and the people around her" and is a drug addict, using opiate pain pills when she first knew her, but later methamphetamine and, around the time of the victim's death, also Fentanyl. Pfortmiller contacted the police after the victim's death because she "knew that [Campbell] had something to do with her death" after she spoke to Campbell the night the victim died. Pfortmiller also thought Campbell was involved because, before that call, Campbell had talked about harming the victim. Pfortmiller did not take those statements seriously at the time, because Campbell had talked about harming a lot of people. Pfortmiller cooperated with the police to record conversations with Campbell. Based on Campbell's incriminating statements to Pfortmiller, the police obtained a search warrant and found a .25 caliber gun and magazine in paint cans in the garage of Campbell's neighbor.

On June 1, 2011, before execution of the search warrant, police observed Campbell and her husband meet with

defendant and his sister in the parking lot of a restaurant. Defendant and Campbell got out of their respective cars and had an "intense" conversation. Defendant then handed Campbell a checkbook—defendant managed Campbell's finances in some unspecified respect—and broke off to speak with Campbell's husband, while Campbell spoke with defendant's sister. Campbell asked defendant's sister, "You didn't tell anyone about what I said, did you?" Later that day, the police arrested Campbell and her husband, because the police believed that they were about to dispose of evidence. Campbell was later indicted on a charge of aggravated murder.

Five months later, in November 2011, defendant's sister reported to the police various statements that Campbell had made to her before the victim's death, starting in about September 2010. She testified that Campbell claimed to have tried to slip the victim drugs, that she had killed before, that her friend Tommy was helping her make a silencer, and that she would kill and dispose of the victim in a few different ways. Defendant's sister testified that, at the time, she did not take Campbell's statements seriously because she "was always talking crazy." She also testified that, after the meeting in the restaurant parking lot, she told defendant about Campbell having talked about killing the victim and that she did not believe Campbell. Defendant's response was "You know, [Campbell] is like that."

Jaynes is Campbell's son. The month after the victim's death, Jaynes's girlfriend, Smith, contacted the police tip line based on statements Jaynes had made to her. Jaynes had acted surprised in her presence about a news report of the victim's death, but she believed that he had earlier accessed news about the victim's death on their shared computer. Smith testified that Jaynes and defendant were comfortable, long-term friends and that, around the time of the victim's death, Jaynes was using a lot of drugs, "[w]hatever his mom would give him." At trial, the state also introduced evidence suggesting that defendant had helped Jaynes get out of criminal trouble in 1999, when Jaynes was 18 years old, by making sure that a police report recommending charges against Jaynes, based on his conduct of having sex

with a 14-year-old girl, was not forwarded to the district attorney's office. The parties refer to this as the "sex crimes coverup" evidence.

In 2012, the state and Campbell entered into a cooperation agreement and, pursuant to that agreement, she testified to a grand jury. That grand jury indicted defendant for aggravated murder, attempted murder, solicitation, and conspiracy, and also indicted Jaynes for attempted aggravated murder and conspiracy. The trial court later severed defendant's and Jayne's charges for separate trials.

The police arrested defendant on November 7, 2012, and, although the charges were filed in Clackamas County, he was held at the Multnomah County Jail pending trial. From April to July 2015, another inmate, Layman, was housed in the same unit as defendant. At some point, one of the jail deputies told Layman that defendant was in jail for killing his wife. After Layman arrived in the unit, he and defendant worked together as trustees in the jail, spending up to eight hours a day together in their duties. After about a month of working together, they also were housed in cells next to each other and they would talk through the vent from their respective cells.

In June 2015, Layman contacted his attorney and asked him to notify the district attorney's office that he had information on defendant. In June and July, Layman gave the state three proffers of information that he had obtained in his conversations with defendant. In July, Layman moved out of defendant's incarceration unit and, in early 2016, Layman and the state entered into a cooperation agreement. In exchange for favorable sentencing recommendations in his pending cases in both Clackamas and Multnomah counties, Layman agreed to testify against defendant.

Also in 2016, Campbell's cooperation agreement with the state fell apart and, ultimately, the state moved to rescind it due to Campbell's breach of that agreement. The trial court granted the state's motion on September 8, 2016, which was about one week before defendant's trial. The state did not call Campbell to testify; as a result, the state's case at trial was based largely on Layman's trial testimony.

During trial, which occurred during September and October 2016, Layman testified about several conversations he had had with defendant. He testified that, early in their conversations, defendant said that he had engaged Campbell and Jaynes to kill the victim and that "he wished he had stopped it because there was an overdose attempt and he should have stopped it then because it got messy." Layman testified that, later on, defendant told him that Campbell and Jaynes had tried to kill the victim with an overdose of Fentanyl, using the Fentanyl patches prescribed to the victim, and that the state had the wrong dates in the indictment on that murder attempt—that it actually was a few months later. Layman also testified that defendant said that he had given Campbell a couple thousand dollars to "rob and shoot his wife," and that the plan was that defendant and Jaynes were going to find the victim's body after Campbell shot her and took money from the till. However, it did not happen that way; instead, Campbell called defendant in a panic, saying that she shot the victim, but she did not die, and Campbell only had the one bullet in the gun. In response, defendant picked up Jaynes and they went to the salon to "finish[] her off," which included beating and choking the victim. Layman testified that defendant told him at first that he had "finished it," but later defendant said that it was Jaynes who did. Layman also testified that defendant told him that the reason he killed the victim was that he did not want the victim to receive any of his retirement funds in a divorce.

The jury found defendant guilty by unanimous verdict of two counts of aggravated murder (Counts 1 and 2) and two counts of conspiracy (Counts 6 and 7) and, by nonunanimous verdict, of one count of attempted murder (Count 8). The trial court merged the guilty verdicts on Counts 2, 6, and 7 into the guilty verdict on Count 1, for a single conviction of aggravated murder. Ultimately, the trial court dismissed Count 8 based on defendant's post-judgment motion. On appeal, defendant raises 31 assignments of error, some of which challenge certain counts, but not others. We address below defendant's assignments 6 through 17, and, based on our disposition of those assignments, we need not reach the remaining assignments.

## II.  VARIANCE OF PROOF FROM
## THE INDICTMENT

In assignments of error 11 to 14, defendant challenges the trial court's denials of his demurrers and motions to dismiss Counts 6 through 8. In assignments of error 15 to 17, defendant challenges the trial court's denials of his motions for judgment of acquittal (MJOA) on Counts 6 through 8. Because defendant's arguments for all those assignments are based on alleged variances from the indictment and the proof presented at trial, we address them together in this section, including those assignments related to Count 8, because defendant argues that the trial court's failure to dismiss that count earlier in the proceedings prejudiced his trial. As explained below, we conclude that the trial court did not err in denying defendant's motions.

A.  *Factual and Procedural Background*

The grand jury indicted defendant on two counts of criminal conspiracy in Counts 6 and 7 and one count of attempted murder in Count 8. For Count 6, the indictment alleged, in part, that

"defendant *** on or about January 1, 2010, *** did unlawfully, with intent that conduct constituting the crime of aggravated murder punishable as a felony be performed, agree with Susan Campbell to cause and engage in the performance of the following conduct, pursuant to an agreement that Susan Campbell receive money and a thing of value for doing so, cause the death of [the victim]."

Similarly, for Count 7, the indictment alleged, in part, that

"defendant *** on or about January 1, 2010, *** did unlawfully, with intent that conduct constituting the crime of aggravated murder punishable as a felony be performed, agree with Jason Jaynes to cause and engage in the performance of the following conduct, pursuant to an agreement that Jason Jaynes receive money and a thing of value for doing so, cause the death of [the victim]."

And for Count 8, attempted murder, the indictment alleged in part that "defendant *** on or about February 6, 2011, *** did unlawfully and intentionally attempt to cause the death of [the victim]."

Before trial, defendant filed a demurrer to the indictment on Counts 6 through 8, arguing that the indictment was no longer based on facts found by the grand jury, violating Article VII (Amended), section 5(3), of the Oregon Constitution. Defendant asserted that Campbell had testified to the grand jury only about a solicitation, conspiracy, and murder attempt between her, Jaynes, and defendant, in which, during the 2011 Super Bowl game, they used insulin in an attempt to poison the victim. However, for trial, the state intended to rely on the testimony of Layman, who would testify about a solicitation, conspiracy, and murder attempt between Campbell, Jaynes, and defendant to poison the victim using Fentanyl patches, which occurred on a different, later date than the alleged insulin attempt. Defendant further argued that the change in theory prejudiced his defense, because he was prepared to defend against allegations related to the overdose attempt with insulin, and not an overdose based on Fentanyl at a later date.

After a hearing, the trial court found that the grand jury notes showed that Campbell had testified to the grand jury about several methods of attempting to kill the victim, including with "[a] gun ***, some drugs—that was mentioned several times[,] or drug overdoses[,] tossing her into a river[,] a fake suicide[,] and a diabetic coma with insulin." The court stated that the grand jury was presented with evidence of drug overdoses, mostly about insulin, but also "other drugs," and that the court could not tell that the grand jury was not presented with the theory that the drug overdose was from Fentanyl patches, as included in "other drugs." Thus, the court concluded that Article VII (Amended), section 5(3) was not offended and that no amendment to the indictment was made by a change in the state's theory of the case. After the state rested its case at trial, defendant renewed his motion to dismiss Counts 6 through 8, which the trial court rejected on the same basis.

Defendant also brought MJOAs on Counts 6 through 8, arguing that the state failed to present any evidence of a conspiracy to commit aggravated murder that occurred on or about January 1, 2010, as alleged in the indictment. Defendant asserted that the only evidence was that, at most,

defendant had failed in an attempt to overdose the victim with Fentanyl in May 2011, based on defendant's uncorroborated confession to Layman. Defendant argued that all of the evidence and witnesses as to the attempted murder charge had concerned an alleged insulin poisoning based on Campbell's then cooperation with the state, and the state never asserted a Fentanyl overdose until Layman brought it up; however, the victim's prescription for Fentanyl started in May 2011, well after the dates alleged in the indictment for conspiracy and attempted murder.

The court denied defendant's MJOAs on Counts 6 through 8. The court first recounted some of the corroborating evidence of an agreement between defendant, Campbell, and Jaynes, noting that "[k]eeping quiet about the sex crime coverup, the relationship between the parties, the financial relationship, *** Campbell's DNA at the scene, *** defendant's motive regarding *** some evidence of domestic violence between him and the victim are all the types of circumstantial evidence that would provide that type of evidence for murder for hire." The court ruled, "I believe that's enough to go to the jury with the other evidence that I've indicated that the state has regarding the existence of an agreement. I think that includes the fact of the day the murder occurred, the victim's relationship falling apart with *** defendant and the prior experience *** defendant had with divorce."

In its closing, the state argued that Counts 6 and 7 related to the agreements between defendant and Campbell and defendant and Jaynes to kill the victim for money or a thing of value. The state further argued that it did not need to prove the date on which the agreement took place, and that the evidence showed it occurred sometime after January 1, 2010, which was the date in the indictment. The state argued that Count 8 related to the poisoning of the victim by Campbell and Jaynes using the victim's Fentanyl, because defendant aided and abetted that crime by soliciting Campbell and Jaynes to kill the victim. The state argued that the date in the indictment was off by a few months, as testified to by Layman as something that defendant told him.

After the entry of judgment on the jury's guilty verdicts, defendant moved for a new trial arguing, among other things, that the state's variance in proof on Counts 6 through 8 amounted to an impermissible amendment of the indictment that prejudiced defendant's case. Ultimately, the court denied defendant's motion on Counts 6 and 7, but granted it on Count 8 and, as a result, dismissed Count 8. The court ruled:

> "As I previously indicated, the Court cannot know from the evidence which theory the grand jury used in Counts 6, 7, and 8. We do know that *** Campbell and not *** Layman testified at the grand jury, however. We do know that the grand jurors' notes reflect they heard about several murder attempts over time and a specific murder attempt around the Super Bowl Game in February 2011 involving an attempted insulin overdose. Counts 6 and 7 involved agreements between co-defendants over time to commit the murder. There was evidence to that effect, albeit by *** Layman's (rather than *** Campbell's) testimony regarding [defendant's] statements within the general time period after the date alleged in the indictment. The grand jury notes failed to identify a specific instance that resulted in the January 1, 2010 date alleged in Counts 6 and 7. The law does not require such specificity in the indictment. No new theory was alleged or proven at trial.
>
> "Count 8 is a different matter. The grand jurors' notes do not reflect they received testimony regarding [F]entanyl patches or pills; only that an attempted insulin overdose occurred around Super Bowl Sunday in February 2011. Evidence at trial was that an attempted murder occurred involving [F]entanyl, that [the victim] had a [F]entanyl prescription issued three months later in May 2011, and that [defendant] told *** Layman that the 'idiots got the dates wrong.' The [s]tate argued that the victim's prescription for [F]entanyl three months after the February date in the indictment was close enough under the 'on or about' language in the indictment and that the grand jurors' notes reflected several overdose attempts over time. However, this argument ignores the fact that the grand jurors' notes specifically link the insulin attempted murder charge to the Super Bowl 2011 date in Count 8. That was not the evidence at trial nor was the change one only 'pertaining to form' versus substance under *State v. Wimber*, [315 Or 103,

843 P2d 424] (1992). Consequently, [d]efendant's Motion to Dismiss is granted as to Count 8 only."

On appeal, defendant assigns error to the trial court's denial of his pretrial motion to dismiss Counts 6 through 8; to the trial court implicitly allowing the state to amend Count 8 in the indictment; to the trial court allowing the state to present evidence of an uncharged murder attempt; to the trial court's denial of defendant's midtrial motions to dismiss Counts 6 through 8; and to the trial court's denial of defendant's MJOAs on Counts 6 through 8. Although defendant presents combined arguments for Counts 6 through 8, we address Counts 6 and 7 separately from Count 8, because they raise different considerations based on the trial court's ultimate dismissal of Count 8 after defendant's post-judgment motion.

B. *Applicable Law*

Defendant's arguments implicate two interrelated lines of case law. Both stem from the requirements of Article VII (Amended), section 5(3), which provides, "Except as provided in subsection (4) and (5) of this section, a person shall be charged in a circuit court with the commission of any crime punishable as a felony only on indictment by a grand jury." The first line of cases addresses whether a state amendment to an indictment that was not first presented to a grand jury is permissible. We evaluate whether an amendment is constitutionally permissible using the three-step inquiry outlined in *State v. Wimber*, 315 Or 103, 843 P2d 424 (1992); *see also State v. Haji*, 366 Or 384, 399, 462 P3d 1240 (2020) (explaining that *Wimber* "was focused on changes to the allegations concerning the crimes charged, as found by the grand jury"). The second line of cases is closely related and addresses whether the state may permissibly present evidence or a theory at trial that varies from the factual proof presented to the grand jury that formed the basis for the allegations in the indictment. To determine if a variance in proof is permissible, we evaluate the two prongs identified in *State v. Long*, 320 Or 361, 885 P2d 696 (1994), *cert den*, 514 US 1087 (1995).

Although defendant makes arguments under both *Wimber* and *Long*, because the state did not seek to amend

the indictment, and the court did not allow any amendments, we follow the analysis set out in *Long* and its progeny, and do not undertake any analysis under *Wimber. See State v. Newman*, 179 Or App 1, 5, 7 n 5, 39 P3d 874 (2002) (where there was not a formal request to amend the indictment, the legal issue was "whether there was a material variance between the allegations in the indictment and the proof at trial," which is analyzed under the methodology in *Long*).

"Whether a variance between the state's pleading and proof is permissible is a question of law, which we review for legal error." *State v. Samuel*, 289 Or App 618, 626-27, 410 P3d 275 (2017), *rev den*, 363 Or 104 (2018). To determine if a variance is permissible, we consider "whether the variance concerns a material element [of the crime] and whether the variance prejudiced the defendant." *Id.* at 627. If the variance either concerns a material element or prejudices the defendant, it is impermissible. *Id.* We determine whether a variance concerns a material element of a crime "by determining whether the indictment states a crime without the disputed allegation \*\*\*, or, in other words, whether that allegation is a material element of the crime." *Newman*, 179 Or App at 9. "'Whether a variance is *prejudicial* depends on the specific *theories* under which a case is argued.'" *Samuel*, 289 Or App at 627-28 (quoting *State v. Boitz*, 236 Or App 350, 356, 236 P3d 766 (2010) (emphases in *Boitz*)). If the variance would require a defendant to develop a different argument or theory of defense, then the variance is prejudicial to the defendant. *Samuel*, 289 Or App at 628.

The court in *Long* addressed one final consideration, which is also present in this case—whether the defendant was, in fact, tried on the offense that was indicted by the grand jury. *Long*, 320 Or at 370. As to that claim, the state has the burden to show that the factual theory on which the grand jury based the indictment was the same one on which the state tried its case. *Id.*; *Samuel*, 289 Or App at 631-32.

## C.   *Analysis of Counts 6 and 7: Criminal Conspiracy*

We first briefly recap the issues raised by defendant below with respect to Counts 6 and 7. Before trial, defendant moved to dismiss the indictment on the ground that the state was no longer relying on the facts that were

presented to the grand jury for those counts. The trial court denied that motion, concluding that the grand jury was presented with the factual theories relied on by the state, that it could not speculate about which theory the grand jury relied on, and that no amendment to the indictment was made. During trial, defendant renewed his motion to dismiss Counts 6 and 7, which the trial court rejected on the same basis. Defendant also argued that he was entitled to an MJOA on Counts 6 and 7, because the factual theory presented at trial did not match the date in the indictment—on or about January 1, 2010. The trial court denied that motion, focusing on the existence of corroborating evidence for defendant's statements to Layman suggesting a conspiracy.

On appeal, defendant argues that the state failed to meet its burden to prove that the crimes for which he was indicted in Counts 6 and 7 were the same crimes for which he was tried and convicted. Defendant argues that the only evidence presented to the trial jury about agreements between defendant, Campbell, and Jaynes were those surrounding (1) the Fentanyl overdose in May 2011 and (2) the completed murder on May 28, 2011. Because the trial court ultimately determined that the Fentanyl overdose evidence was not presented to the grand jury and was not the factual basis for the attempted murder count (Count 8), defendant argues that that evidence also could not be the factual basis for the conspiracy charges in the indictment. With respect to the completed murder, defendant argues that there was no evidence presented to the grand jury that there was an agreement devised in January 2010 to kill the victim in May 2011 and that "it is not possible that the grand jury based Counts 6 [and] 7 on agreements that might be inferable from the circumstances surrounding those crimes." Defendant further argues that the variance was prejudicial because it stripped him of the defense theory that the conspiracy could not have begun in or about January 2010, because that is around the same time that defendant and the victim became domestic partners.

Relatedly, with respect to the denials of his MJOAs, defendant argues that, with respect to Count 7—conspiracy

between defendant and Jaynes—the state presented no evidence that, on or about January 1, 2010, defendant entered into an agreement with Jaynes to pay Jaynes to kill the victim, and it also presented no circumstantial evidence to support a nonspeculative inference that such an agreement was made. Defendant asserts that the only evidence—aside from defendant's confession to Layman about an overdose attempt—that could support an inference of a conspiracy with Jaynes is the plan they concocted in the immediate aftermath of Campbell's attempt to kill the victim on May 28, 2011. Defendant argues, however, that that conspiratorial agreement, which occurred 17 months after the date in the indictment, would allow defendant to be convicted on proof that is a prejudicial variation from the indictment.

With regard to his MJOA on Count 6—conspiracy between defendant and Campbell—defendant argues that there was no evidence of an agreement entered into, on or about January 1, 2010, for defendant to pay Campbell to kill the victim. Defendant asserts that the only evidence of an agreement was Layman's testimony that defendant had said that he had agreed to pay Campbell $2,000 to shoot the victim. He asserts that, because that evidence was not linked to the date in the indictment, "there is no evidence of the specific conspiracy to commit aggravated murder that the grand jury charged."

Defendant also asserts that the state's "ongoing conspiracy" theory is not legally cognizable, because conspiracy is a crime that is complete on agreement, and any subsequent conduct is not part of the crime; it is merely evidence of the prior agreement. The problem, defendant argues, is that the subsequent conduct must be rationally linked to proving the indicted agreement, not a different, later, uncharged agreement.

In response, the state asserts that there was no variance of proof at all with respect to Counts 6 and 7. The state argues that its trial theory was that defendant, Campbell, and Jaynes entered into a conspiratorial agreement, which resulted in multiple murder attempts, and continued until they killed the victim, and that that theory was consistent with the facts and theory presented to the grand jury.

The state argues that the only possible variance is that it did not prove an exact date on which the conspiracy started. That variance, the state asserts, is neither material nor prejudicial. The state asserts that time is not a material element of conspiracy and that it only needed to prove that an agreement did, in fact, exist, which is proved through circumstantial evidence of the steps taken in furtherance of such an agreement. The state also counters that defendant's theory of prejudice is not cognizable, because prejudice rests on whether "the date in the indictment misled the defendant and prejudiced him in the preparation of his defense." The state argues that defendant knew well before trial that the state's theory was an ongoing conspiracy that started sometime after January 1, 2010, and ended with the death of the victim. In addition, the state argues that it presented sufficient evidence that defendant conspired with Jaynes and Campbell to kill the victim before the actual day of the murder.

Based on the parties' arguments, the variances of proof at issue here are that (1) specific evidence of the conspiracy at trial was not tied to the date in the indictment and (2) the state relied on different circumstantial evidence to support its theory of conspiracy before the grand jury and at trial—specifically, that the attempted murder Layman testified about at trial (the Fentanyl overdose) was not the attempted murder Campbell testified about to the grand jury (the insulin overdose) that formed the basis for Count 8 in the indictment. We conclude that those alleged variances are neither material nor prejudicial under *Long*.

We first address if those variances are material, which requires us to determine whether the variance concerns a material element of the crime "by determining whether the indictment states a crime without the disputed allegation." *Newman*, 179 Or App at 9; *see also Samuel*, 289 Or App at 627 ("The test for whether a variance concerns a material element depends on whether the indictment states an offense without the allegation." (Internal quotation marks and brackets omitted.)).

The first alleged variance in proof is that the specific evidence of conspiracy presented at trial, which

primarily centered on the alleged conspirators' conduct in April and May 2011, was not tied to the date in the indictment for Counts 6 and 7—January 1, 2010. That alleged variance was a basis for both defendant's motions to dismiss and his MJOAs as to the conspiracy charges. That date, however, is not a material element of the crime. The date could be struck from the indictment, and it would still state the crime of conspiracy. Under ORS 161.450(1), "[a] person is guilty of criminal conspiracy if with the intent that conduct constituting a crime punishable as a felony or a Class A misdemeanor be performed, the person agrees with one or more persons to engage in or cause the performance of such conduct." The date of the formation of such an agreement is not a material element of the crime of conspiracy—if the date were struck from the indictment in Counts 6 and 7, it would still state the crime of conspiracy.

The variation in proof as to the overdose attempt is also not material to the charged crimes of conspiracy. As charged in the indictment, defendant was accused of committing criminal conspiracy, "on or about January 1, 2010," with the intent that aggravated murder be performed, agreed with Campbell (Count 6) or Jaynes (Count 7) that "pursuant to an agreement that [Campbell or Jaynes, respectively] receive money and a thing of value for doing so, cause the death of [the victim]." That statutory theory of the crime was not tied to specific circumstantial evidence of steps taken in furtherance of the conspiracy, and it was the theory submitted to the jury at trial. There was no variance in that respect to which the first prong of the *Long* analysis could apply. *See Samuel*, 289 Or App at 627.

We turn to whether the alleged variances were prejudicial under *Long*. "Whether a variance is prejudicial depends on the specific theories under which a case is argued." *Boitz*, 236 Or App at 356 (emphases omitted). "[T]he variance between the state's pleading and its proof [is] impermissible [when] it require[s] defendant to defend against a different theory than that specified in the indictment." *Samuel*, 289 Or App at 630. The test is whether the defendant was misled or prejudiced in the preparation of his defense. *State v. Kowalskij*, 253 Or App 669, 674, 291 P3d

802 (2012), *rev den*, 353 Or 748 (2013). To illustrate that test, for example, in *Boitz*, the state had alleged, as a sentence enhancement fact, that the defendant had been on "release status from other pending criminal charges," when he committed the crime. The trial court found the enhancement fact based on evidence that the defendant was on probation and out in the community. *Boitz*, 236 Or App at 352-53. We concluded that the variance was impermissible under the prejudice prong of *Long* because defendant's theory of defense was that he did not commit the crimes while criminal *charges* were pending and allowing the variance would have required the defendant to develop a different theory of defense. *Id.* at 356. In contrast, for example, in *State v. Stavenjord*, 290 Or App 669, 672, 415 P3d 1143, *rev den*, 363 Or 481 (2018), the charging instrument alleged that the crime occurred "on or about July 21." The state's proof at trial was that the crime occurred on July 19. The defendant argued that the variance was prejudicial because she had an alibi for July 21. We rejected the defendant's argument that any variance was prejudicial, because the defendant was not surprised by the proof at trial that the theft took place on July 19—that evidence included a police report and a date-stamped surveillance video that the defense received well before trial. That is, the alleged variance did not prejudice the defendant's ability to prepare a defense to the charged crime. *Id.* at 673-74.

Here, defendant's theory of prejudice is that he had no motive to conspire to kill the victim in January 2010, as opposed to a later, different date, and the variance was, thus, prejudicial to his defense. Defendant's theory of prejudice is also intertwined with his argument that the attempted murder to which Layman testified—an overdose in May 2011 using Fentanyl—could not form the factual basis for the conspiracy charges, because it was not presented to the grand jury. That argument speaks to the additional consideration in *Long* identified above—whether the defendant was, in fact, tried on the offense for which he was indicted by the grand jury. *Long*, 320 Or at 370. The state has the burden to show that the factual theory on which the grand jury based the indictment was the same one on which the state tried its case. *Id.*; *Samuel*, 289 Or App at 631-32.

With regard to the additional consideration, as already explained, the statutory theory of the crime as indicted was the theory submitted to the jury at trial, and, more to the point for prejudice under *Long*, the state's *factual* theory of conspiracy did not change between the indictment and trial. The state's factual theory was that sometime after January 1, 2010, defendant and Campbell, and defendant and Jaynes, formed an agreement that, in exchange for a thing of value, Campbell and Jaynes would cause the victim's death, and that that agreement continued until the victim's death. As found by the trial court, the grand jury notes do not reflect that it was presented with any evidence that tied the conspiracy charges to the January 1, 2010, date in the indictment. As it did with the trial jury, the state primarily presented evidence to the grand jury of a murder attempt and murder that both occurred in 2011 as circumstantial evidence that the conspiracy existed. The factual allegations supporting the conspiracy charges, as indicted and as tried, were not tied to a particular murder attempt or the completion of the murder, nor were they required to be. *See State v. Brewer*, 267 Or 346, 350, 517 P2d 264 (1973) (explaining that proof of an overt act in furtherance of the conspiracy is not required by ORS 161.450); *see also State v. Brewer*, 12 Or App 105, 108-09, 504 P2d 1067, *aff'd*, 267 Or 346, 517 P2d 264 (1973) ("The existence of a conspiracy, and its objective, may be proven by circumstantial evidence. The conspiracy may be inferred from the circumstances and from the declarations, acts, and conduct of the conspirators." (Internal citations and quotation marks omitted.)). The state thus did show that the factual theory on which the grand jury based its indictment was the same as the factual theory on which it tried the case. *Cf. Samuel*, 289 Or App at 631-32 (distinguishing *Long* because "in this case the state did not carry its burden of proving that the factual theory upon which the grand jury based its indictment was the same as that upon which the state tried its case"). The state was not required to limit itself to only the circumstantial evidence that had been presented to the grand jury to support the inference that the conspiracy was formed sometime between January 1, 2010, and the completion of the murder. Rather, it could present different circumstantial evidence of the

same conspiracy at trial to support that same factual theory of the crime.

Additionally, because the factual theory of the crimes did not vary, defendant was not prejudiced by the evidence of conspiracy at trial not being tied to the date in the indictment of January 1, 2010. Defendant's argument that he did not have a motive to conspire to kill the victim in January 2010 is not the type of prejudice to which the prejudice prong in *Long* is directed. *See Stavenjord*, 290 Or App at 673 (defendant was not prejudiced by a variance in the proof of the date of the crime where defendant argued she had an alibi for the date in the indictment, but not the date proved at trial). *Long* looks at whether the variation caused the defendant to be misled or prejudiced in preparation of a defense. As explained, the state's factual theory of conspiracy did not change such as to prejudice defendant's ability to prepare a defense.

Finally, we reject defendant's assertion that the state's "ongoing conspiracy" theory is not legally cognizable. As stated above, the state was not required to prove that the conspiracy agreement occurred on a particular date. It is also logical that conspirators could take actions in furtherance of a conspiracy that play out over time. Those subsequent actions are still circumstantial evidence that a conspiracy exists, and began at some point before those actions, even though the actions may be removed in time from the initial agreement. There is nothing about the state's theory that suggests its factual theory of the conspiracy prejudicially varied from the indictment.

There is one additional matter that defendant argues with respect to his MJOA on Count 7—defendant's conspiracy with Jaynes. In addition to the variance in proof, defendant asserts that the state failed to present evidence of a conspiracy with Jaynes at all, other than what may have occurred in the moment when Campbell failed to kill the victim with the gunshot on May 28, 2011. We reject that argument without extended discussion. Viewed in the light most favorable to the state, there was sufficient evidence from which the jury could find that defendant conspired with Jaynes to kill the victim in exchange for a thing of value.

D.	*Analysis of Count 8: Attempted Murder*

	Having determined that the court did not err in not dismissing Counts 6 and 7, we turn to defendant's assignments of error as they pertain to Count 8. The trial court did ultimately dismiss Count 8, following entry of the judgment. As a result, it would appear that defendant's assignments are moot, or that any error is harmless. Defendant, however, asserts that the assignments are not moot or harmless, because the trial court's failure to dismiss Count 8 before or during trial allowed the state to present evidence of an uncharged attempted murder (the Fentanyl overdose), which, but for the trial court's delayed ruling, he could have challenged as inadmissible prior bad act evidence or obtained a limiting jury instruction. Defendant also argues that the court's error undermined the structural integrity of the entire trial for various reasons.

	We conclude that any error in failing to dismiss Count 8 earlier in the case was harmless, because the evidence of the attempted Fentanyl overdose was relevant and admissible as circumstantial evidence of the existence of the conspiracy alleged in Counts 6 and 7. As a result, the evidence was not susceptible to a challenge as inadmissible prior bad acts evidence, which applies when prior bad acts are offered "to prove the character of a person in order to show that the person acted in conformity therewith." OEC 404(3); *see also State v. Jackson*, 368 Or 705, 717, 498 P3d 788 (2021) ("If the proponent's theory of relevance requires the factfinder to employ propensity reasoning—to rely on an inference about the defendant's bad character and resultant propensity to commit criminal acts—at any link in the chain of logical relevance, then the evidence is subject to the limits on character evidence in OEC 404(3)." (Internal quotation marks omitted.)); *State v. Skillicorn*, 367 Or 464, 475-76, 479 P3d 254 (2021) ("'"[C]haracter" for purposes of evidence law means a person's disposition or propensity to engage or not engage in certain types of behavior.'" (Quoting Laird C. Kirkpatrick, *Oregon Evidence* § 404.03, 213 (7th ed 2020).)). Here, the evidence was relevant for a noncharacter (or propensity) purpose. The evidence that Campbell and Jaynes attempted to administer a Fentanyl overdose to the

victim was circumstantial evidence of the existence of the charged conspiracy between defendant and Campbell and Jaynes and the chain of logical relevance from that evidence to that ultimate fact does not rely on an inference relating to defendant's character or propensity to commit criminal acts. Accordingly, we reject defendant's arguments.

In sum, the trial court did not err in any of the respects asserted in defendant's assignments of error 11 through 17.

### III.   MOTION TO SUPPRESS DEFENDANT'S STATEMENTS TO LAYMAN

We next address the trial court's denial of defendant's motion to suppress all or some of his statements to Layman, which defendant raises in assignments of error 7 through 10. Defendant argues that, based on the government involvement in Layman's obtaining information from defendant, Layman was acting as a state agent and, because defendant was represented by counsel for the pending charges in this case, Layman's questioning of defendant violated his rights under Article I, sections 11 and 12, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution. We review for legal error, while accepting the trial court's findings of historical fact. *See State v. Smith*, 310 Or 1, 12-15, 791 P2d 836 (1990) (taking that approach under the Oregon Constitution); *U. S. v. Henry*, 447 US 264, 270, 100 S Ct 2183, 65 L Ed 2d 115 (1980) (similar approach under Sixth Amendment).

As explained below, we conclude that, after the second proffer meeting with Layman on July 2, 2015, the state involvement in Layman's questioning of defendant was sufficient to trigger the state constitutional exclusionary protections. Accordingly, the trial court erred in failing to suppress statements that defendant made to Layman after that July 2 meeting, and that error was not harmless.

### A.   *Factual and Procedural Background*

The trial court made extensive findings of fact after a five-day suppression hearing. We take the following from the trial court's findings of fact, as supplemented by undisputed testimony at the hearing on defendant's motion.

From April to July 2015, Layman was incarcerated in the same unit as defendant in the Multnomah County Jail, while Layman awaited resolution of charges for robbery and kidnapping in Multnomah County and charges for drug delivery in Clackamas County. He was placed in the unit for protective custody after he offered testimony to the state against fellow inmates at a different facility. As found by the trial court, Layman had "often provided testimony against other inmates o[r] co-defendants in the past for various types of consideration from law enforcement and prosecutors," including offering testimony against co-defendants in the cases pending against him in 2015. And, "[s]ometimes his offers and information have been received positively resulting in benefit to him and sometimes they have not."

Defendant worked as a trustee in the unit, which meant that he was allowed out of his cell for long periods to work in the unit during the day, primarily to clean and serve meals. Shortly after Layman arrived, defendant was transported to Clackamas County for a hearing and, while he was away, Layman also became a trustee. When defendant returned, Layman and defendant shared information about their lives while they worked together as trustees. Layman was unaware that defendant had been a police officer and initially was unaware of defendant's charges. After about a month and one-half of working together, Layman and defendant were placed in cells next to each other at their request. As the trial court found, "[w]hen Layman learned from Multnomah County [d]eputies that [d]efendant was involved in the murder of a woman, Layman took private notes of those conversations without dating them." Defendant was very "tight-lipped" about his case, but, after a while, he began to share information with Layman about his pending charges, including, within a couple of weeks, implying that he had committed the murder. Layman did not review or read any of the discovery that defendant kept in his cell.

In early June, Layman contacted his attorney and asked him to notify the Clackamas County District Attorney's Office (CCDA) that he had information about defendant. Then-Deputy District Attorney John Wentworth told CCDA

Investigator Brian Schmautz that Layman wanted to talk to them. To arrange the meeting, Schmautz called the jail and spoke with a captain and asked that Layman be put on the court docket for "something" so that he could be transported to the Multnomah County Courthouse "and it would not appear as if he's meeting with law enforcement." The captain made that arrangement for transport.

On June 16, Layman and his two attorneys—one who represented him in his Clackamas County case and one who represented him in his Multnomah County case—met with Wentworth, another Clackamas County Deputy District Attorney, Lewis Burkhart, Schmautz, and Oregon State Police Detective Scott Sudaiser. Layman signed a proffer agreement.

For the proffer, which was video recorded, Layman read and explained a lengthy letter that contained notes on conversations he had had with defendant, then answered questions, and gave the letter to Schmautz. The proffer lasted about an hour. Before he began reading, Layman stated that he did not know that so many people would be present, so he wanted to just read; he told them that if he said "today" from his notes, it did not mean today, but could be some time during the months that he had talked to defendant. Schmautz asked if Layman could try to date when defendant had made the statements. Layman then read his letter, which included statements from defendant that "he wishes he would have had his wife killed in Multnomah County, because Clackamas County is crooked, and he would only be looking at a little bit of time"; that he "should have stopped it after the idiots screwed up the overdose"; that "[h]e wishes he stopped it after the overdose attempt, because it got messy"; that he should have left the country after Campbell "started telling"; that his girlfriend knows "that he did it"; that the only reason Jaynes had not turned on defendant was "because they haven't offered him a good enough deal"; that Jaynes was involved with the overdose; that Campbell's husband was there and knew about the overdose; and that the victim "had it coming."

After Layman read his letter, Schmautz asked him questions. Layman answered that he did not know anything

about defendant's case other than what defendant had told him; he had not looked at any of the discovery that defendant kept in his cell. Schmautz also asked if defendant had disclosed how Campbell, Jaynes, and Campbell's husband were involved. Layman said that he did not know how Jaynes was involved, and that, according to defendant, Campbell "did it" and the husband was at the crime scene. Schmautz also asked if Layman knew what defendant's college degree was in or what he did for a job before the murder. Layman did not know.

Sudaiser asked specific questions about the overdose attempt. Layman answered that there was only one attempt that defendant talked about and that Campbell and Jaynes were involved. He did not know what was used for the attempt or when it occurred, and he did not know what defendant meant by "it got messy." Sudaiser also asked questions about defendant's role in the murder and what he did after the murder, before his arrest. Layman did not know. Layman believed that defendant was giving Campbell something for the murder, maybe drugs.

Near the end of the proffer, Schmautz and Layman had the following exchange:

> "[Schmautz]:   So, [Layman], just so you're clear we do not want—we're not directing you or telling you to have any conversations with [defendant]. He's represented by attorneys, and we don't want you to think—
>
> "[Layman]:   Right.
>
> "[Schmautz]:   —the fact that you're talking to us we would in any way direct you, or tell you to have any conversations with him.
>
> "[Layman]:   All right."

The questioning continued, with Sudaiser asking Layman why he had taken notes and started talking to the investigators and district attorneys. Layman said that he wanted to remember what defendant had said if he had to "talk to you" and that he "would hope that it would help me in my case." Layman also said that he did not like that defendant did this to a woman. The trial court found that "[n]o agreement [for consideration] existed at the time."

At the end of the proffer, Schmautz said, "So if there's anything that you remember that you need—that you think that we do need to know to make an informed decision, will you tell one of your attorneys, and they can contact the prosecutor." According to the trial court's findings, Schmautz "did not tell Layman NOT to ask any further questions." (Uppercase in original.)

Layman was returned to the unit where defendant was also housed, and he continued to talk to defendant and take notes on their conversations, this time making sure to note the date of their interactions. At the suppression hearing, Layman testified that he had started writing down dates in his notes because he "knew the dates were important" and "as soon as they asked me about the date [at the first proffer] I was like, you know what, I should—I should write the date on these." Also, as the court found, "Layman continued to cooperate with law enforcement regarding other cases in Multnomah and Clackamas Counties."

After the proffer, Wentworth asked Schmautz to secure a location at the courthouse where they could again meet with Layman to negotiate consideration in exchange for Layman's testimony. Schmautz followed the same procedure as before—contacting the captain to arrange Layman's transport for a hearing on "something," so it would not appear that he was talking to law enforcement. Wentworth told Schmautz that Schmautz was not expected to interview Layman, "unless he had information not provided in the original proffer."

On July 2, Layman met with his two attorneys, Wentworth, Burkhart, and Schmautz. When it was clear that an agreement for consideration for Layman's testimony was not going to be reached, Wentworth was prepared to terminate the meeting. At that point, Layman said that he had more information to give them. His second proffer of information was audio recorded and lasted about 30 minutes. Layman told Schmautz that this time he had recorded the dates of his conversations with defendant, and Schmautz responded that he did want those dates. Layman again read and explained his notes, answered questions, and turned the notes over to Schmautz.

Layman's new notes started on the day after his first proffer and included comments from defendant about his trial strategy, his relationship with his girlfriend, and additional facts about the murder. Layman conveyed statements from defendant that he had moved out a month before the murder, and "he should have stopped it because it was going to look bad"; that the victim was "shot then beat to death"; that Campbell and her husband went to shoot the victim, shot her once, left, and then called defendant, who did not answer the call; that defendant was planning to find the victim, but, when defendant got there, the victim was alive and "so he had to finish it"; and that Campbell only had one bullet and it was only .25 caliber. Defendant also ended that story by saying that that was what the state had alleged and that most of it was already out in the media. Layman also said that, during another conversation, defendant told him that he did not report the victim's death after he "finished it," but left and later got a call from someone and they met at the shop. Layman asked, "what did you do, win an Oscar?" and defendant said "yes," he "went to his knees and started wailing."

Schmautz asked for more information, focusing on if defendant had told Layman where he was when he got the call from Campbell, if defendant said how he had harmed the victim, and if defendant told him what Jaynes did. Layman did not have answers to those questions. Schmautz also confirmed that Layman and defendant were still housed together at the jail. Schmautz then said, "So as I said last time you have to understand we are not directing you to have any communication *** with [defendant] at all." Layman responded:

> "Yeah. As a matter of fact, after our last conversation, I've kind of—I kind of actually pulled back a little bit, like, okay, it's kind of done. He's not going to tell me anything.

> "When he hit me with that, that was, like, kind of out of left field, like he just *** there was a part of me, like I didn't even want to go back and write it down. I was like, 'This could just be all complete bullshit.'"

Schmautz asked Layman who initiated those conversations, and Layman said that it "stemmed from" Layman

asking defendant if there was anything new after defendant had had a meeting with an attorney or investigator. Layman would then ask specific questions once defendant started talking. Schmautz asked if defendant had talked about his former occupation. Layman said that defendant was some type of a manager and teaches some kind of class on emergency response. No cooperation agreement between Layman and the CCDA existed at the time of the second proffer.

That night after the second proffer, Layman wrote to Multnomah County Judge You, stating that he had developed incriminating information on defendant and that he was trying to negotiate a "fair deal" with the CCDA that would factor into his open sentencing in his Multnomah County case. He stated that they had met "today" to "finalize the deal" and that he thought the CCDA was going to offer him significant time cut from his sentence. Instead, Wentworth only offered to run Layman's Clackamas County sentence concurrent with his Multnomah County sentence, which Layman described as "a slap in the face, considering how much time and energy and stress me, you, my lawyer and the DA have all gone through dealing with Clackamas County *** figuring a way around the uncooperative stance." He asked for "70 to 120 months suspended and release to inpatient treatment" and five years' probation. He closed the letter saying, "my testimony is worth a lot more than [Wentworth] wants to admit. He wouldn't even talk to me if it wasn't."

On July 6, Layman's attorney in his Clackamas County case obtained a trial continuance in that case without objection from the district attorney.

On July 8, Layman sent a letter to Wentworth about a deal on his sentencing. Layman wrote that he was "excited" when he was going into the second meeting and he "knew the info [he] had on [defendant] was even better." Layman wrote that the deal Wentworth offered was the same one he had already worked out through 10 months of negotiation and the information that he had provided with regard to a different inmate. Layman asked Wentworth "if you will recommend to [Multnomah County] Judge You a long, suspended sentence."

Layman sent Wentworth a second letter the same day with additional information on defendant. Layman wrote that defendant had told him that Jaynes was with him when they went to check on the victim, that they found her alive and had to "finish it." Defendant also told Layman that he was a police officer. Layman asked Wentworth "for 90 months suspended sentence contingent on my testimony and completing of drug treatment." Layman further wrote that Wentworth should be willing to get him the suspended sentence and, if not, "we go our separate ways." Layman later wrote Wentworth a third time, claiming that he had "46 more pages of info on [defendant]." He wrote that he had new information about how Jaynes helped defendant kill the victim, about defendant's trial strategy, and that Campbell had called defendant and he had answered the phone in front of two other police officers, while Campbell "was freaking out" about having just shot the victim. In both of those letters, Layman asked Wentworth to contact his attorneys so that he could turn over the new information. Wentworth did not respond to any of the letters.

On July 18, Layman was moved to a different area of the Multnomah County Jail, apart from defendant, without consultation with the CCDA.

On July 30, Layman and one of his attorneys met with Wentworth, Burkhart, Schmautz, Sudaiser, and a prosecutor for Multnomah County, Dennis Shen, for a third proffer, which was video recorded, and lasted for a little over an hour. Layman read from his notes, then answered questions, and handed over the notes. The notes again included the dates that Layman had spoken with defendant, and they began the day after his last proffer, July 3.

Layman explained how, on July 3, in a conversation with defendant, Layman had inquired whether he could ask defendant specific questions about his case, and defendant said that he could. Layman then proceeded to ask specific questions on different days, and, in response, defendant provided many new incriminating statements, until Layman was moved from the unit on July 18. Defendant told Layman details about Jaynes's role in the murder, including that Jaynes was the one who "finished it." Defendant

also revealed that he had been a police officer and answered questions from Layman about the district attorneys he used to work with. With regard to the attempted overdose, defendant told Layman that Campbell had mixed up her days and months such that she was "a couple months off" of when the overdose attempt happened. Layman asked defendant how she was going to overdose, and defendant replied, "Fentanyl," which the victim was taking for shoulder pain. Defendant also told Layman more details about the day of the victim's murder, including what the original plan had been and how it fell apart when Campbell shot the victim once and she did not die. Layman asked what he had given Campbell, and defendant said a couple thousand dollars. Layman asked about the murder weapon; defendant would not say what it was, but he revealed that the police had not found it and that it likely had incriminating DNA on it. Layman also asked about defendant's motive, and defendant said that he did not want the victim to get any of his money in a divorce. Defendant also revealed that he was nervous about his school records being subpoenaed, because it would show that he was a trained EMT, yet he did not do anything to try and save the victim when he found her.

After Schmautz and Sudaiser asked Layman questions, the recording was stopped. Although Layman was no longer housed near defendant, Schmautz admonished Layman that they were not instructing Layman to talk to defendant. That admonishment was not recorded.

After the third proffer, negotiations continued between Layman and the CCDA, which included settlement conferences with the judge and district attorney in Layman's Multnomah County case. Of note, on September 10, Layman's attorneys met with Judge You, Wentworth, Burkhart, and Shen. After they met, Wentworth and Burkhart left the room, and Layman met with his attorneys, Judge You, and Shen for a settlement conference on his Multnomah County case. On September 16, Layman sent Wentworth a letter because he was angry that he had heard that a Clackamas County district attorney had "suggested Multnomah threatened [*sic*] to charge me with a dangerous offender [sentence]" at the meeting that had occurred without Layman. Layman clarified in his testimony that he was

told dangerous offender sentencing was "brought up," not that he was threatened with it. Layman wrote in his letter that he could not be scared into doing anything. He then asked for a recommendation of 60 months with good time in his Multnomah County case and stated that he thought he could get 70 months without having to testify. A Multnomah County district attorney on Layman's case testified that her office had not discussed the possibility of dangerous offender sentencing in Layman's case and that it was decided "early in the case" that it would not be sought.

After continued negotiation, on or about January 16, 2016, Layman entered into a cooperation agreement with the CCDA. Under the agreement, Layman committed to cooperate and testify in defendant's case and, in exchange, the CCDA would appear at his Multnomah County sentencing and speak on his behalf, and, in the interim, sentencing in that case was held open. Layman faced a minimum sentence of 70 months in Multnomah County, but the agreement permitted the Multnomah County DA to continue to seek up to the maximum sentence.

In addition, the trial court found the following:

"27.   At no time during the proffers did law enforcement or the prosecutors share information regarding [d]efendant's case with Layman or ask Layman to question [d]efendant about specific subjects. The subject matter of the questions of Layman may have suggested that they were investigating or what they deemed important. However, there is no evidence that *this* was the impetus behind Layman's subsequent conversations of questioning of [d]efendant.

"28.   Layman has a history of mental health issues or treatment and drug and/or alcohol issues or treatment. There is no evidence that these potential issues influenced his contact with law enforcement or prosecutors. At the time of the proffers, law enforcement was aware that Layman had some of these issues.

"29.   Layman had a meeting with Clackamas County Deputy District Attorney Wentworth before he testified [at the suppression hearing] in this case regarding 'agency' and being truthful."

(Emphasis in original.)

The trial court concluded that any "circumstantial encouragement" by law enforcement or prosecutors was insufficient to establish that Layman was acting as an agent of the state or warranted application of the exclusionary rule under *State v. Sines*, 359 Or 41, 379 P3d 502 (2016). The court also concluded that there was not "positive official encouragement to obtain incriminating statements" under *State v. Lowry*, 37 Or App 641, 588 P2d 623 (1978), because there was no evidence that the state intended Layman to ask defendant questions on behalf of the state and, unlike in *Lowry*, "Layman was never placed or allowed to remain with [d]efendant purposefully to illicit said information; nor was he compensated before or during his conversations with [d]efendant." The court also concluded that, using the words of the Sixth Amendment legal standard, "[t]here is no evidence that law enforcement or the prosecutors took some action beyond merely listening to Layman that was designed deliberately to elicit incriminating remarks of [d]efendant." Finally, the court concluded that "law enforcement was not directly or indirectly involved to a sufficient extent in initiating, planning, controlling, or supporting Layman's activities." The court denied defendant's motion to suppress.

B.   *Arguments on Appeal*

In four assignments of error, defendant alternatively argues for four different temporal points at which Layman became a state agent, such that defendant's statements to Layman must be suppressed after that point. Those four points are (1) as soon as Layman began talking to defendant, (2) June 16, 2015, the date of Layman's first proffer, (3) July 2, 2015, the date of Layman's second proffer, and (4) July 6, 2015, the date that Layman's trial date in Clackamas County was set over. Defendant argues that his statements to Layman should have been suppressed under both Article I, sections 11 and 12, and the Sixth Amendment, because Layman was sufficiently encouraged or supported by the state in obtaining information from defendant to warrant such suppression.

Defendant points to the following facts as significant for all four temporal points: Layman had a history of providing information to the state in exchange for benefits

and was actively working as an informant on a different matter when he met defendant; Layman was moved to the same protective custody housing that defendant was in because of Layman's work as an informant; a deputy informed Layman that defendant was being held on a murder charge; Layman and the state understood that, when Layman contacted the state and arrived to make his first recorded statement, the state was seeking to assess the value of Layman's information and Layman was hoping to obtain a benefit from the state in exchange; and the state encouraged Layman's conduct by having four high-ranking members of the prosecution team meet with Layman, by telegraphing to Layman the topics that it wanted more information on, and by stating that they were open to receiving additional information from Layman. Defendant argues that the state's statement that it was not "directing" Layman to elicit additional information from defendant could not undo the encouragement that the state already had given. Defendant argues that all of his statements to Layman should have been suppressed because no practicable separation of admissible and inadmissible statements could be made from Layman's testimony, but, at the least, he was entitled to suppression of all of the statements he made to Layman after the date of the first proffer.

In the alternative, defendant asserts that Layman became a state agent by his second meeting with the state on July 2, 2015. Defendant points to the following additional facts to support that position: the state again communicated with the jail to facilitate obtaining information from Layman; the state recognized that Layman might develop additional information from defendant in response to the first proffer; the state exercised leverage over Layman in its benefit offer, prompting Layman to provide additional information (and putting Layman on notice that he needed to obtain additional information to get the benefit he wanted); Layman started documenting the dates of defendant's statements, after the state requested such dates during his first proffer, and he provided information to answer the questions the state had asked during the first proffer; the state asked additional questions at the second proffer and confirmed that Layman was still housed with defendant; and, in his

letters, Layman set out the relationship he believed he had with the state and how valuable his information was to the state.

In addition, defendant argues that Layman made it clear in his third proffer that he had sought to obtain information from defendant on the state's areas of interest by asking defendant direct questions in those areas, as revealed by the state's questions during the prior proffers. Defendant also argues that Wentworth's prepping Layman on the law of agency before the motion to suppress hearing is relevant because it reveals the extent of the relationship between Layman and the state and the state's expectations by the time of the third proffer.

Finally, in a second alternative, defendant argues that Layman became a state actor no later than July 6, 2015, "when the state collaborated with Layman to ensure a setover in [Layman's] Clackamas County drug case." Defendant argues that, by that time, the CCDA was working with Layman, prolonging its ability to provide him a benefit in his Clackamas County case and to try to persuade Multnomah County to settle with Layman.

The state responds that, because state officials never asked Layman to ask defendant questions, Layman was never an agent of the state and, thus, the protections under Article I, sections 11 and 12, were never triggered. That is, the state argues, because the state never made an objective manifestation that authorized Layman to act on its behalf, Layman was not a state agent. The state argues that the state officials warned Layman that the state was not requesting that he ask defendant any questions, did not encourage Layman to meet with defendant, did not suggest topics for Layman to explore with defendant, and did not agree to any terms of a cooperation agreement. The state argues that the inferences defendant argues should be made from the circumstances are contrary to the findings made by the trial court. The state asserts that at no point while Layman was talking with defendant did the state create an impression that Layman was its agent or that it had an agreement with Layman. Similarly, the state argues that Layman was not a state agent for purposes of

the Sixth Amendment, because the state did not take any action beyond listening to Layman; that is, the state did not instruct or make an agreement with Layman to ask defendant any questions.

We first address the issue under the state constitution.

C. *Analysis under the Oregon Constitution*

   1. *Applicable law*

Before addressing defendant's fact-based arguments, we begin with a discussion of the applicable law under Article I, section 11.[3] Here, the parties disagree on the precise test we must apply to determine if Layman's conduct can be attributed to the state, such that his questioning of defendant was a violation of defendant's right to counsel and against self-incrimination. Defendant argues that we apply solely the test articulated in *Smith* and *Lowry*, and that the Supreme Court's more recent opinion in *Sines* does not apply. Defendant urges us not to apply the reasoning in *Sines*, because it was decided under Article I, section 9, of the Oregon Constitution and not Article I, section 11, which has different considerations at play, particularly in the jailhouse informant context, due to the leverage the state has to provide benefits to those informants. The state for its part urges us to apply the common-law agency principles informing the court's decision in *Sines* to determine if Layman was acting at the behest of the state in this case. To resolve the tension in the parties' arguments, we examine the applicable case law.

Under Article I, section 11, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." "After a defendant has been charged with a crime and the right to counsel has attached, Article I, section 11, of the Oregon Constitution prohibits the police from asking the defendant about that crime without first notifying his or her lawyer." *State v. Prieto-Rubio*, 359 Or 16, 18, 376 P3d 255 (2016). The remedy for an Article I,

---

[3] Defendant also argues that Article I, section 12, applies here. However, defendant does not make a separate argument under that section, which applies when a defendant is questioned by the state under compelling circumstances. As a result, we only address Article I, section 11.

section 11, violation is to exclude from trial "any prejudicial evidence obtained as a result of that violation." *Id.* at 38. It is axiomatic that constitutional rights protect a defendant from state action. So, the question in the context of a jailhouse informant questioning a defendant about a criminal charge is whether the informant is acting at the behest of the state.

In *Smith*, the Oregon Supreme Court adopted the rule that we established in *Lowry* to determine whether a jailhouse informant is a "police agent" such that statements made by the defendant to the informant are subject to exclusion under Article I, section 11. That rule provides that, "if the police were directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting the informant's activities, the exclusionary protection would apply." *Smith*, 310 Or at 13 (internal quotation marks and brackets omitted). The inquiry requires each case to be evaluated on its own facts. *Id.* Applying that fact-intensive inquiry, the court concluded that the defendant's statements in that case were not subject to the exclusionary rule, because the officials in the case "made no deals with [the informant], paid him no money, and offered him no encouragement; nor did [the informant] request any." *Id.* at 14.

In *Lowry*, we articulated that rule based on federal precedent in *Massiah v. United States*, 377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964), and *McLeod v. Ohio*, 381 US 356, 85 S Ct 1556, 14 L Ed 2d 682 (1965). *Lowry*, 37 Or App at 650 ("The only substantial issue in this case is whether there was sufficient official police involvement in [the informant's] obtaining of any of the statements from defendant to bring into play the exclusionary protection of the Fifth Amendment."). We emphasized that "'[t]he extent of official involvement in the total enterprise is the crucial element.'" *Id.* at 652 (quoting *State v. Becich*, 13 Or App 415, 419, 509 P2d 1232 (1973)). Examining closely the extent of official involvement in the informant's obtaining statements from the defendant, we concluded that many of the defendant's statements were not subject to suppression. However, once official involvement became sufficient—which included giving positive encouragement to the informant and delaying

a transfer of the informant to get a taped statement, which enabled the informant on his own initiative to obtain more detailed information from the defendant—we concluded that the defendant's statements made to the informant after the date of sufficient involvement must be suppressed. *Id.* at 655-56.

More recently, the Oregon Supreme Court has addressed when a private citizen becomes a "police agent" such that suppression of evidence derived from a search by that private citizen is necessary. In *Sines*, a housekeeper suspected that her employer was sexually abusing his child in the home. After speaking to an employee of the Department of Human Services (DHS), the housekeeper took items of the child's clothing from the home and turned them over to the police so that they could be tested for the presence of semen. Defendant sought suppression of evidence obtained through the search and seizure of the clothing under Article I, section 9, arguing that the housekeeper was acting at the behest of the state when she seized the clothing. 359 Or at 43, 47.

In determining what type of state involvement was necessary such that the private person could be "said to be acting on behalf of government in some sense," the court started with *Smith*, as "confront[ing] a similar issue." *Id.* at 53. The court noted that *Smith* followed an agency analysis and looked at whether the officers were involved to a sufficient extent such that the informant "could be described as having acted 'at the behest' of the state." *Id.* at 54 (quoting *Smith*, 310 Or at 15). The court noted that other courts have used agency analysis in the search and seizure context. The court then concluded that "common-law agency principles can provide substantial assistance in determining when a private citizen's search or seizure should be considered state action for purposes of Article I, section 9," and adopted the use of such principles to determine whether a private actor should be considered a state agent for purposes of Article I, section 9. *Id.* at 55, 59. The court formulated the test as whether the facts of the case, "and in particular the conduct and statements of the state officials, demonstrate that those officials communicated to the housekeeper (and [the] defendant's other employee) that they were authorized to act as agents of the state." *Id.* at 59. That analysis

"looks first to objective manifestations by the principal to the agent that the agent should or may act on behalf of the principal." *Id.* Because there was not sufficient "affirmative encouragement, initiation, or instigation" in the case on the facts as found by the trial court, the court determined that the housekeeper was not acting as a state agent when she searched for and seized the clothing. *Id.* at 60-61.

Because the court in *Sines* repeatedly tied its analysis to searches and seizures under Article I, section 9, defendant argues that its reasoning does not apply in this case, which involves Article I, section 11. Although it is not entirely clear that the Supreme Court would apply *Sines* to Article I, section 11, and specifically in the context of a jailhouse informant, we also cannot ignore that the court started its reasoning in *Sines* from the "similar issue" raised in *Smith*, which the court read as applying agency analysis in that context. Also, we do not read *Sines* to articulate a test that is dramatically different from *Smith* or *Lowry*. Both *Smith* and *Lowry* explained that the exclusionary rule applies only if the informant was operating as a police agent, which requires a fact-intensive inquiry of the official involvement in obtaining statements from the defendant. While those cases did not specifically state that they were drawing on common-law concepts of agency, they did focus on the objective statements and conduct of the actors, which also was the focus in *Sines*. Under both *Smith* and *Sines*, the Supreme Court articulated a test that asks whether the private person was acting as a state agent, and the reasons articulated in *Sines* for focusing on objective manifestations (such as affirmative encouragement, initiation, or instigation) from the government actors apply equally to a jailhouse informant.

However, in making that observation, we disagree with the state's assertion that *Sines* requires us to apply a common-law agency test here. *Sines* stated only that common-law agency principles can provide assistance in the search and seizure context, not that a strict application of those principles is required. *Sines* also did not overrule or abrogate *Smith*, despite expressly acknowledging the test that *Smith* sets out for determining whether a jailhouse informant qualifies as a state agent.

We thus conclude that all three cases—*Smith*, *Lowry*, and *Sines*—inform our analysis here. *Smith* and *Lowry* provide significant guidance on the totality of state involvement that is sufficient to trigger constitutional exclusionary protections when a jailhouse informant questions a represented defendant, and *Sines* informs that we must focus on objective statements and conduct and not on private motivations of the state or the informant. With that understanding, we turn to the application of those legal principles in this case.

　　2.　*Application of* Smith*,* Lowry*, and* Sines *in this case*

First, we readily conclude that Layman was not acting as a state agent in questioning defendant either before or after the first proffer. Before Layman directed his attorney to contact the CCDA, the CCDA was not aware of Layman or that he had been talking to defendant. The mere fact that Layman had worked as a jailhouse informant on prior occasions did not make him a police agent with respect to defendant. *See Lowry*, 37 Or App at 653 (rejecting such reasoning). At that point, there was no objective manifestation by the state that gave Layman any encouragement or authority to question defendant.

State involvement was also insufficient following the first proffer. Although there was some state involvement at that point, including a video-taped proffer with several prominent members of the investigation team present, indicating their interest in the information, there was no discussion whether Layman would receive a benefit in return for that information, even though he indicated that he expected a benefit. Layman's past success at obtaining a benefit for his informant activities did not create sufficient state involvement in Layman's questioning of defendant to make him a state agent at that point. *See Lowry*, 37 Or App at 653 ("[P]ast episodes [of receiving benefits for informing on other inmates] did not constitute sufficient involvement in Reed's self-initiated interrogation of defendant to bring into play the exclusionary protection.").

Schmautz also admonished Layman that the state was not directing him to ask defendant any questions. We note that Schmautz somewhat contradicted that

admonishment by telling Layman that he should tell his attorney, for the purpose of contacting the CCDA, "if there's anything that you remember that you need—that you think that we do need to know to make an informed decision." The reasonable inference conveyed by that direction is that the CCDA was considering whether to give Layman a benefit in return for his information, and that the CCDA was open to receiving additional information from Layman to make a decision about whether to give Layman a benefit. However, at that point, there were little to no objective manifestations from the state that positively encouraged Layman to *continue* questioning defendant.

The more difficult question that this case raises is whether Layman became a state agent after the second proffer on July 2, 2015. The level of state involvement in Layman's questioning of defendant shifted significantly after the second proffer, which began as negotiations to give Layman a benefit in return for his testimony against defendant. Layman was expecting significant assistance with his open sentencing in his Multnomah County case, but had not been offered any such assistance by the CCDA. At that point, Layman told Schmautz and the others present that he had additional information on defendant. Schmautz took that information immediately, using a back-up audio recorder, instead of setting up a more formal proffer arrangement, as had occurred with the first proffer, indicating the CCDA's willingness to obtain more information about defendant through Layman. The information that Layman provided showed that he had shifted his approach (recording the dates of conversations with defendant) and focused on topics that the state was interested in (details on how the victim died and the roles of Campbell, Jaynes, and defendant in the murder) in response to questions raised by Schmautz and Sudaiser during the first proffer. Schmautz again asked questions of Layman that focused on particular areas of interest. Layman also explained that he was *questioning* defendant—that he was not just passively receiving the information. However, no one from the state told Layman to cease questioning defendant. Instead, Schmautz said, again, after confirming that Layman and defendant were still housed together, that they were not "directing" Layman to question defendant.

At that point in the relationship between the state and Layman, the state was positively encouraging Layman to continue to question defendant through objective manifestations of assent to Layman's activities, including securing his presence for in-person negotiations to obtain his testimony against defendant, receiving additional information on defendant after those negotiations stalled, and asking about additional topics after Layman successfully obtained information on topics the state had previously asked about in the first proffer. The state was involved in serious negotiations with Layman to give him a benefit in return for his information and, when it offered a deal to Layman that was significantly less than what Layman sought, he was incentivized to obtain more information from defendant to make a deal happen. *Compare Smith*, 310 Or at 14-15 (no positive encouragement of the informant where the informant initiated contact with police deputies, the deputies instructed the informant not to question the defendant, the informant did not question the defendant, only listened, the informant did not ask for a deal and none was offered, and the informant did not know before his sentencing that the deputies would speak on his behalf), *and Lowry*, 37 Or App at 654-55 (the exclusionary rule did not apply where a detective told the informant that he was not interested in information on the defendant and that the informant should not be asking questions of any inmate), *with Lowry*, 37 Or App at 655-56 (positive official encouragement for additional incriminating statements did occur when a different detective expressed interest in information on the defendant, attempted to obtain a recorded statement from the informant, and failed to discourage the informant from questioning the defendant further after the informant's attempt to negotiate for a benefit in return failed).

Although we are focused on the state's affirmative actions, *see Sines*, 359 Or at 61-62 (failing to discourage private conduct is not sufficient to bring a private search within the scope of Article I, section 9), we do take some account of the fact that the state also did not in any way *discourage* Layman's activities, after giving him positive encouragement and an incentive to continue those activities. Here, Schmautz only said that the state was not "directing"

Layman to question defendant; however, Layman made clear that he was continuing to do so—confirming that he was the initiator of the information-gathering conversations with defendant—after the first time that Schmautz made the same admonishment following the first proffer. The state had no reason to believe that Layman would behave any differently upon hearing that carefully worded admonishment again, particularly in light of the willingness of the CCDA to receive more information on defendant from Layman in the posture of ongoing negotiations with him.

In sum, on or by July 2, Layman understood from CCDA that the level of assistance CCDA was offering for the sentencing in his cases depended on the quality of information that he obtained from defendant. The state's actions assented to that understanding. That understanding between Layman and the CCDA was further confirmed when Layman immediately laid the groundwork with defendant on July 3, the day after the second proffer, to ask defendant even more pointed questions about his case and the murder. In so concluding, we are not making factual inferences that are contrary to the trial court's findings, as the state argues would be necessary. Rather, we reach a different legal conclusion based on the facts found by the trial court, because, in our view, the factual distinctions that the court observed between this case and *Lowry* do not make this case *legally* distinguishable. By July 2, the totality of the state's involvement in Layman's activities of questioning defendant about the murder of the victim was sufficient to trigger the state constitutional exclusionary protections.

The state argues, relying on *Sines*, that, because state officials never asked Layman to question defendant, Layman was never an agent of the state and, thus, the protections under Article I, section 11, were never triggered. That argument ignores the objective manifestations of positive encouragement that the state did provide to Layman by the time of the second proffer, instead focusing solely on whether the state directed Layman to ask questions. *Sines* does not require such a specific manifestation of assent to an informant's activities. If it did, then it would undermine the protections of the exclusionary rule, because it would allow

the state to provide all the hallmarks of positive encouragement and assistance in a jailhouse informant's activities, but avoid any consequences of that relationship merely by stating that the state is not requesting the informant to ask questions, even while the state's actions encourage the informant to ignore that statement, as both the state and the informant readily understand.

We conclude that, by the end of the second proffer, official involvement in Layman's questioning of defendant was sufficient to bring the constitutional exclusionary protection into effect for purposes of Article I, section 11, and any statements made by defendant to Layman after July 2, 2015, must be suppressed. However, because the information obtained by Layman was clearly delineated by the dates on which it was obtained through the recorded proffers, we reject defendant's argument that all of defendant's statements must be suppressed on the basis that it is impracticable to separate the admissible from the inadmissible statements.

We also conclude that the error in not suppressing the statements defendant made to Layman after the meeting on July 2 is not harmless. It is after that meeting that Layman sought out specific information from defendant and obtained several details about the conspiracy and murder, including that Campbell and Jaynes attempted to overdose the victim with the victim's prescription Fentanyl and that Campbell was "a couple months off" on the date, details about the original murder plan and how it fell apart, Jaynes's role in the murder, the compensation defendant promised to Campbell, and defendant's motive.

Accordingly, we reverse and remand defendant's conviction on Counts 1, 2, 6, and 7.

D.  *Analysis under the United States Constitution*

Because we conclude that the statements defendant made to Layman before the July 2 meeting are admissible under the Oregon Constitution, we briefly address and reject defendant's arguments under the Sixth Amendment with respect to those statements.

"[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Maine v. Moulton*, 474 US 159, 176, 106 S Ct 477, 88 L Ed 2d 481 (1985). The question is whether, under the facts of the case, a government agent "deliberately elicited" incriminating statements from the defendant. *Henry*, 447 US at 270. Or, in other words, whether the government "intentionally create[ed] a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *Id.* at 274.

Defendant argues that, under *Henry*, his Sixth Amendment right to counsel was violated because defendant's statements were "deliberately elicited" by Layman and that conduct is attributable to the government. Defendant argues that, for the same reasons as stated with respect to the state constitution, his statements to Layman should be suppressed under the Sixth Amendment.

For the same reasons that we reject defendant's arguments under the Oregon Constitution with regard to the statements that he made to Layman before July 2, we reject defendant's arguments under the Sixth Amendment.

## IV.   *IN CAMERA* REVIEW OF GUYTON'S RECORDS

We also address defendant's sixth assignment of error, because it raises an issue of law that is likely to arise on remand, and we determine that it is appropriate to do so. *State v. Savage*, 305 Or App 339, 342, 470 P3d 387 (2020) ("Ordinarily, we will consider issues likely to arise on remand when the trial court or agency has determined a question of law that will still be at issue after the case is remanded."); *see also State v. Merrill*, 309 Or App 68, 71, 481 P3d 441, *rev den*, 368 Or 402 (2021) ("Even when a disposition obviates the need to address an assignment of error, we may nevertheless address questions of law that may still be at issue after the case is remanded.").

In his sixth assignment, defendant argues that the trial court erred when it refused to conduct an *in camera*

review of records of a mental health evaluation of Layman that Guyton conducted in 2014. The trial court's refusal was based on its conclusion that defendant did not make a sufficient threshold showing for such a review. We review that issue for legal error, and we are bound by the trial court's factual findings, if supported by the record. *State v. Cockrell*, 284 Or App 674, 682, 395 P3d 612, *rev den*, 361 Or 886 (2017). As explained, we conclude that the trial court did not err.

A.  *Factual and Procedural Background*

Because defendant's arguments with respect to Guyton's records shifted over time and were made at several points pretrial and at trial, we set out with some detail the procedural history of his *in camera* request.[4] In 2014, Layman was being held on charges of identity theft and criminal trespass in Multnomah County. During that time, he was making calls to his girlfriend, which were recorded. In May 2014, he told his girlfriend that his attorney had retained a doctor to give him a 600-question evaluation to use for his sentencing. Guyton, a forensic psychologist, conducted the evaluation of Layman. In June, Layman told his girlfriend that his attorney could not use the evaluation, because Guyton had told the attorney that, "if she tells them what I said in our interview, *** the next time I catch a felony they will never let me out of prison, ever." In July 2014, Layman pleaded guilty to the charges and his attorney did not disclose the evaluation.

Before defendant's trial, in 2016, he subpoenaed the Oregon Youth Authority, Multnomah County Corrections Health, and the Washington Department of Corrections for Layman's medical and mental health records and obtained those records. Defendant also subpoenaed Guyton to produce

---

[4] Defendant's assignment of error fails to identify the specific trial court ruling that he challenges; instead he assigns error to a legal issue, on which the trial court made several rulings, both pretrial and during trial. That manner of briefing does not conform with ORAP 5.45(3), and it impedes our review, as both the record and defendant's arguments were different with respect to each trial court ruling. *See, e.g.*, *Wingett v. Silbernagel*, 279 Or App 245, 252, 379 P3d 570, *rev den*, 360 Or 697 (2016) ("An assignment of error does not comply with ORAP 5.45(3) if it assigns error to what is essentially a legal conclusion and not a specific ruling." (Internal quotation marks omitted.)). However, under the circumstances of this case, we deem it appropriate to address the merits of defendant's assignment as to the precise arguments that defendant raises in his opening brief.

her records relating to Layman. Layman moved to quash
that subpoena based on attorney-client privilege, and Guyton
asserted the psychotherapist-patient privilege at the hear-
ing on Layman's motion. In response, defendant argued that
Layman had waived those privileges and, in the alternative,
requested that the trial court review the records *in camera*
for disclosure of relevant evidence.

At the hearing, defendant presented witnesses in
support of his waiver argument, including Detective
Sudaiser and Sergeant Edwards, who had met with Layman
in January 2016. According to the witnesses, at that meet-
ing, Layman told them that he had had inconsistent men-
tal health diagnoses, including that he had, at one time,
been diagnosed with ADHD and bipolar disorder, but other
psychologists had disagreed with those diagnoses. He also
was, at one time, diagnosed with depression and anxiety.
Layman specifically told them that Guyton's records had
been subpoenaed by defendant and he did not want them
released. Defendant argued that he was entitled to all of
the records, but, for purpose of *in camera* review, he was
entitled to impeachment evidence related to Layman's
lying, drug use, violence—in particular violence toward
women—and his ability to accurately perceive, recall, and
relate events. Before the trial court ruled on that motion,
defendant also filed a motion to compel the state to disclose
Guyton's records, reasoning that the state's failure to obtain
those records was essentially consideration to Layman in
exchange for his cooperation.

The trial court granted Layman's motion to quash,
concluding that he had not waived the attorney-client privi-
lege. The court also concluded that defendant "failed to show
sufficient evidence to support a reasonable belief that an
*in camera* review may yield evidence establishing an excep-
tion to the nondisclosure or the privilege." The court found
that there was no evidence that the various diagnoses
Layman disclosed he had received—bipolar disorder, depres-
sion, ADHD, or anxiety—"would, in and of themselves, sug-
gest *** Layman was fabricating the story to the State."
The court also found that there was "no evidence that these

diagnoses were made by Dr. Guyton," and that, "frankly, I believe it's a fishing expedition."

With regard to defendant's motion to compel, the trial court issued a letter opinion denying the motion. The trial court found and concluded:

> "In this motion, [defendant] argues because of *** Layman's statements [saying the evaluation would 'hurt him' if it were to 'get out,'] the Guyton evaluation has become consideration to the agreement between the State and *** Layman because the State has failed to obtain control of the materials or subpoenaed them which may have been used by the State in the pending open sentencing in Multnomah County. There is no evidence to support this position. [Defendant] further argues that the records are within the State's control because of the Cooperation Agreement between the State and *** Layman.
>
> "The Court has already ruled that the Cooperation Agreement between the State and *** Layman does not extend to mental health records that *** Layman has specifically refused to release to the State. *** Layman has NOT given up his privilege to those records, his doctor refused to release the records without his permission, law enforcement has asked for them, and is not required to continue to ask for them. They are not within State control."

(Uppercase in original.)

Defendant then moved for reconsideration of the trial court's refusal to conduct an *in camera* review of Guyton's records for material impeachment evidence, based on a then-newly-issued case, *State v. Lammi*, 278 Or App 690, 75 P3d 547, *adh'd to as clarified on recons*, 281 Or App 96, 380 P3d 1257 (2016), *rev den*, 360 Or 697 (2017). At the hearing, defendant referred to additional items of evidence that had been admitted during defendant's motion to suppress hearing with respect to statements he made to Layman—specifically, evidence that Layman wrote to Wentworth during the time that he was negotiating with the CCDA, expressing anger that a Clackamas County district attorney had brought up dangerous offender sentencing in his Multnomah County case, and that Layman had made a statement in May 2016 to his mental health case manager that he had been diagnosed with antisocial

personality disorder earlier in the year and that he does not agree with the diagnosis. Defendant argued that Guyton's records would contain material impeachment evidence related to Layman's motivation and bias, because the evaluation might have made Layman believe that he was susceptible to dangerous offender sentencing, such that Layman would be "trying to appease" the Clackamas County district attorneys in his three proffers.

The trial court denied that request, concluding that *Lammi* did not change the state of the law governing a trial court's *in camera* review of documents. The trial court reaffirmed its ruling that defendant had not made a threshold showing for *in camera* review. The court also concluded that the state not obtaining Guyton's records was not some form of consideration, because the records were protected by the attorney-client privilege, Layman's attorney did not use the evaluation, and the evaluation was not available to the state; thus, Layman "didn't need the Clackamas County District Attorney's help in avoiding the consequences of the report because there were NO consequences." (Uppercase in original.)

At trial, after the state finished its direct examination of Layman, defendant moved for reconsideration of a prior ruling of the trial court that restricted defendant's use of Layman's mental health records, arguing that he should be permitted to ask Layman about his mental health problems, as documented in his mental health records, because the state's examination opened the door. The trial court permitted questions about Layman's criminal and drug history, but ruled that defendant could not ask about Layman's mental health history or drugs to treat his mental health, with the exception that the trial court permitted defendant to cross-examine Layman about his mental health history related to his ability to remember. After obtaining that ruling, defendant sought reconsideration of its motion to compel production of Guyton's records, arguing that Layman had waived any privilege. The trial court denied that motion.

During the cross-examination of Layman, defendant again renewed his request to obtain Guyton's records and his request for the trial court to conduct an *in camera*

review of them. Defendant argued that he did not know what type of report it was, but believed that it was an evaluation relevant to Layman's dangerous offender status. The trial court denied the renewed motion and declined to review the records *in camera*, on the same basis as previously litigated.

B.  *Analysis under Federal Due Process*

On appeal, defendant assigns error to the trial court's refusal to conduct an *in camera* review of Guyton's records for material impeachment evidence. Defendant's argument is based on federal due process, as discussed in *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), and *Pennsylvania v. Ritchie*, 480 US 39, 107 S Ct 989, 94 L Ed 2d 40 (1987). Under *Brady*, to comply with federal due process, the state must disclose to a defendant all evidence in its possession or control that is material and favorable to the defense. *State v. Bray*, 363 Or 226, 236, 422 P3d 250 (2018). And, under *Ritchie*, the state may be required to assist a defendant in obtaining *Brady* material from third parties in certain circumstances, such as by requiring the court to enforce a defendant's subpoena. *See Bray*, 363 Or at 237-38 (discussing *Ritchie*); *see also Ritchie*, 480 US at 57-58 (affirming remand for the trial court to conduct *in camera* review of subpoenaed records for *Brady* material, which were privileged under state statute).

"To establish that a defendant's due process rights were violated by a trial court's failure to conduct an *in camera* review [of confidential records,] the defendant must first 'demonstrate that the items of which he sought review would have been material and favorable to his defense.'" *State v. Covington*, 291 Or App 514, 518, 422 P3d 276, *rev den*, 363 Or 727 (2018) (quoting *Cockrell*, 284 Or App at 689). "Evidence is favorable to a defendant if it is exculpatory or if it could be used to impeach a government witness." *Id.* at 517. "Material evidence is evidence that is not merely relevant but, rather, is evidence that 'has a "reasonable probability" of affecting the outcome of the proceeding.'" *Id.* (quoting *State v. West*, 250 Or App 196, 204, 279 P3d 354 (2012)). The defendant must also show "that it is reasonable to believe that the [records] contain that evidence." *Id.* at 518; *see also Ritchie*, 480 US at 58 n 15 ("Ritchie, of course, may not require the trial

court to search through the [Children and Youth Services] file without first establishing a basis for his claim that it contains material evidence. *See United States v. Valenzuela-Bernal*, 485 US 858, 867, 102 S Ct 3440, 3446, 73 L Ed 2d 1193 (1982) ('He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.'))." Thus, with regard to defendant's request that the trial court conduct *in camera* review of the privileged Guyton records, defendant was required to first make the threshold showing that it is reasonable to believe that those records contain *Brady* material.

Defendant argues that he made that threshold showing, because it was plausible that Guyton's records contained material impeachment evidence. He argues that, based on Layman's statements to his girlfriend, there was evidence that Layman took a 600-question evaluation that, if revealed to the state, would expose him to a lengthy prison sentence. He also argues that, based on Layman's letter to Wentworth, there was evidence that the state threatened to charge Layman as a dangerous offender if he did not testify against defendant and, based on the 2016 statement by Layman that he had been diagnosed with antisocial personality disorder, that it was likely that Guyton's evaluation showed that he had antisocial personality disorder or another disorder that qualified him as a dangerous offender. Because a dangerous offender sentence would have exposed Layman to an indeterminate 30-year prison term, defendant argues, an evaluation showing Layman qualified for such sentencing "would constitute qualitatively unparalleled evidence of Layman's bias or interest to testify falsely against defendant." Defendant also argues that Guyton's records would show Layman's inability to perceive, understand, and recall, which is material impeachment evidence.

The state responds that defendant did not make a sufficient showing. The state argues that defendant was required to show that Guyton's records contained material that was constitutionally required to be disclosed, despite their privileged nature, based on fundamental fairness. The state argues that defendant did not do that here, because

the trial court found that Layman's cooperation agreement with the state had nothing to do with his mental health records, and Guyton's evaluation was not likely to be used to increase Layman's sentence. In addition, the state argues that defendant did not make a plausible showing that the records would reveal information about Layman's ability to perceive or remember or a motive to lie. Thus, the state argues that the trial court did not err in concluding that defendant failed to make a plausible showing to support an *in camera* review of Guyton's records.

We first address defendant's arguments as they relate to Layman's exposure to dangerous offender sentencing. The record supports the trial court's finding that Layman "didn't need the Clackamas County District Attorney's help in avoiding the consequences of the report because there were NO consequences." (Uppercase in original.) The only evidence in the record pertaining to dangerous offender sentencing, as it related to Layman's agreement to testify, was Layman's assertion in a letter to Wentworth that a *Clackamas County* district attorney had asserted in a meeting with a *Multnomah County* Judge and district attorney that defendant could be sentenced as a dangerous offender— a meeting, the record also reveals, that Layman did not attend. There was no evidence that dangerous offender sentencing was ever contemplated by the judge or district attorney in Multnomah County—the only evidence in that regard was from the Multnomah County district attorney, who testified that it was decided early on that dangerous offender sentencing would not be sought. *See* 317 Or App at 416-17 (describing evidence introduced at state agent hearing). And, it is undisputed that the state did not, in any event, have access to Guyton's evaluation to use it against Layman. In that context, defendant did not make any showing how Guyton's records could be used to impeach Layman or were otherwise relevant to the defense. That is, defendant did not show a rational relationship between what defendant believes is in Guyton's records and Layman's bias or motive to testify for the state pursuant to his cooperation agreement with Clackamas County. *See State v. Naudain*, 368 Or 140, 150, 487 P3d 32 (2021) (the relevance of impeachment evidence to show bias requires "a rational relationship

between the [bias] issue and the proffered evidence"); *see also State v. Guffey*, 291 Or App 729, 737-38, 422 P3d 293 (2018) (a threshold showing of materiality for DHS records was not made under the defendant's theory, where the defendant failed to show how they could be used to cross-examine the witness or were otherwise relevant to the theory of the defense). Thus, it is not reasonable to believe, based on any argument that relies on exposure of Layman to dangerous offender sentencing, that Guyton's records contain information that is material and favorable to defendant's defense.

With regard to defendant's secondary argument, that Guyton's records would contain material impeachment evidence related to Layman's ability to perceive, understand, and recall, we conclude that Layman did not make a threshold showing for *in camera* review. Defendant did not make any showing that it is reasonable to believe that Guyton's records were qualitatively different in what they would show about Layman's ability than the other mental health records that defendant did obtain.[5] Defendant admitted below that he did not know what type of report Guyton had made, but surmised that it was related to Layman's potential dangerous offender status. However, defendant made no showing as to the relationship between a dangerous offender evaluation and Layman's ability to perceive, understand, or recall. *See Guffey*, 291 Or App at 738 (court did not err in refusing to review school records *in camera* where defendant did not make a threshold showing that the records contained qualitatively different information than what defendant already possessed). *Cf. Covington*, 291 Or App at 520 (the defendant made threshold showing that it was plausible that grand jury notes would disclose material impeachment of a witness that was a different type of evidence than defendant used to impeach the witness). Defendant did not make a sufficient showing that it is reasonable to believe that Guyton's records contain information that is material and favorable to defendant's defense.

---

[5] Defendant asserts in his briefing that the other mental health records disclosed drug use, medical history, and mental health history with a reported effect on Layman's ability to perceive, understand, and recall. The trial court permitted defendant to cross-examine Layman about his mental health history related to his ability to remember.

Accordingly, the trial court did not err in refusing to conduct an *in camera* review of Guyton's records.

## V.   CONCLUSION

In sum, we conclude that the trial court did not err in rejecting defendant's challenges based on the variances in proof at trial from the indictment. However, we conclude that Layman was acting as a state agent when he questioned defendant about his pending charges after July 2, 2015. The trial court erred in not granting defendant's motion to suppress the statements he made to Layman after that date. Because that error was not harmless, we reverse and remand defendant's conviction on Counts 1, 2, 6, and 7. Further, we reverse defendant's conviction on Count 8, because the trial court granted defendant's post-judgment motion to dismiss that count, but did not enter a corrected judgment reflecting that dismissal. Finally, we consider and reject defendant's sixth assignment of error, concluding that the trial court did not err in refusing to conduct an *in camera* review of Guyton's records.

Conviction on Count 8 reversed; conviction on Counts 1, 2, 6, and 7 reversed and remanded; otherwise affirmed.